# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ALLISON LAMONT NORMAN,        :
                                           :
         Petitioner,            :
                                           :
       v.                        :       Civ. Act. No. 14-187-LPS
                                           :
DAVID PIERCE, Warden, and ATTORNEY    :
GENERAL OF THE STATE OF DELAWARE,   :
                                           :
         Respondents.         :

---

Allison Lamont Norman. *Pro se* Petitioner.

Elizabeth R. McFarlan, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Attorney for Respondents.

---

## MEMORANDUM OPINION

September 29, 2017
Wilmington, Delaware



**STARK, U.S. District Judge:**

Pending before the Court is an Application For A Writ Of Habeas Corpus Pursuant To 28

U.S.C. § 2254 ("Petition") filed by Petitioner Allison Lamont Norman ("Petitioner"). (D.I. 3) For

the reasons discussed, the Court will dismiss the Petition and deny the relief requested.

## I. BACKGROUND

The facts leading to Petitioner's convictions are set forth below, as recounted by the

Delaware Supreme Court in Petitioner's direct appeal:

> In a tragic shooting spree that unfolded across fifteen miles and two
> states on April 7, 2001, [Petitioner] shot at numerous people while
> delirious, killing two and wounding several others, including one
> woman who became paralyzed. [Petitioner] fatally wounded Jamell
> Weston and wounded Marcus Cannon near a school bus stop at the
> entrance to the Carvel Gardens apartment complex in Laurel,
> Delaware. Afterward, [Petitioner] stole a parked car from the
> apartment complex and drove to Salisbury, Maryland. Along the way,
> Anthony White attempted to ask [Petitioner] for a ride home, but as
> White approached the vehicle, [Petitioner] shot and wounded him.
> When [Petitioner] reached Delmar, Maryland, he shot at a garbage
> truck and crew, but none of the workers sustained injuries. While
> continuing to drive to Salisbury, [Petitioner] shot at several people and
> vehicles, wounding Marsha Hankerson. When he arrived at his friend
> Tobias Cannon's home in Salisbury, [Petitioner] took one of his dogs
> and shot two others. He then shot and killed Davondale Peters after
> Peters gave him a ride. [Petitioner] also shot Carla Green, who was
> driving with her daughter, leaving Green paralyzed. After shooting
> Peters and Green, [Petitioner] chased after witnesses and went from
> house to house in Salisbury, eventually breaking into the home of Mary
> and Watson Dutton, an elderly couple. He left their home without
> harming them and was arrested a short time later by Wicomico County
> Sheriff's officers.
>
> The defense presented evidence that [Petitioner] was acting in the
> throes of a psychotic episode driven by bizarre delusions that were the
> culmination of a lifetime of exposure to abuse, violence, and criminal
> conduct. As related by psychiatrists at trial, [Petitioner] experienced a
> concurrence of factors which contributed to this mental state. On
> April 17, 2003, his older brother, Shane DeShields, and a friend killed

a man in a botched attempt to steal the drugs the man was selling. [Petitioner], who deeply admired DeShields, was crushed by his brother's imprisonment. He attended DeShields' capital murder trial and witnessed his conviction. At his brother's penalty hearing, evidence was presented that DeShields and [Petitioner], when young children, were sexually assaulted by a babysitter, Ben Green. [Petitioner], as a child, had begged his mother not to leave them with Green. He was furious at her for having kept the abuse quiet and for denying him the support of family and friends. His anger toward his mother was renewed by the cavalier attitude he felt she displayed about the assaults at the hearing. On October 8, 2004, DeShields was sentenced to life in prison.

On October 16, 2004, [Petitioner] was parked at a convenience store in Delmar, Maryland when two men approached his vehicle and opened fire. [Petitioner] returned fire, but was shot in the abdomen and leg. His wounds required surgery to his colon and he was hospitalized for several weeks. [Petitioner] was charged with a weapons offense in connection with the shooting and faced a potential ten year prison sentence in Maryland upon his release from the hospital.

After his discharge from the hospital, [Petitioner] moved in with his mother in Seaford. Although still in pain from the surgery, he stopped taking his prescribed medications; instead, he consumed marijuana and ecstasy. For the next few months, [Petitioner] took two to four ecstasy tablets per day and regularly smoked marijuana. He was terrified that his life was in danger because he did not know the identity of at least one of the men who shot him, and he suspected that his own friends were involved.

In January 2005, [Petitioner] moved to Carvel Gardens in Laurel to live with his girlfriend, Kisha DeShields, and her five children. He was the father of one of Kisha's children, five-year-old Donesha. On January 10, Ronshelle Harmon gave birth to [Petitioner's] son, Ny'Kael. [Petitioner] did not sign the birth certificate, but he visited Harmon in hospital and occasionally visited Ny'Kael in early Spring 2005, sometimes bringing Donesha along.

On April 6, knowing he faced up to ten years in jail on the weapons charge, [Petitioner] failed to appear for his scheduled Maryland court appearance. A warrant was issued for his arrest. [Petitioner] spent a few hours with his friend Devon Cannon, during which time they smoked marijuana. He also took ecstasy. He then discussed potentially killing his mother, even scouting a gravesite in the wooded

area to which he and Devon had traveled.  [Petitioner] then began to fear that Devon might kill him, and told him so, but later apologized.

Later that night, [Petitioner] started to believe he had special powers of vision.  He thought he could see things in the dark and that things turned white for him in the darkness.  He believed he was blessed with this special gift.  When Kisha seemed to ignore or neglect him, [Petitioner] became angry, pointed a gun at her, and told her not to "disrespect" him.  He then danced around the apartment, announcing that he was the Messiah who ruled the world.

After [Petitioner] calmed down, he watched an episode of the television show, The X-Files.  He formed the belief that aliens or demons were trying to get into the children's bedrooms to kidnap and rape them.  [Petitioner] went into their rooms and, thinking his enhanced vision allowed him to see the creatures outside in the darkness, he yelled at them and chased them.  Thinking that this was a test to see if he could protect his family, [Petitioner] "guarded" the children that night by pinching and pulling the little girls' hair in the belief that their screams would cause the aliens or demons to retreat.

By the next morning, [Petitioner] appeared to Kisha to be better, though he still expressed concern for the childrens' safety.  [Petitioner] later explained that, based on recent experiences, he also had formed the belief that black people had been taken over by the demonic forces he was fighting.  According to [Petitioner], even though some of the people he shot at were white, he believed them to be black, and therefore evil, when he shot at them.

[Petitioner's] delusions continued.  After helping Kisha get the children ready for school, [Petitioner] donned a bulletproof vest and, armed with a gun, took Donesha to the bus stop at about 8 a.m.  On their way, they encountered Jamell Weston and Marcus Cannon, who were returning from dropping off Weston's nephew and Cannon's girlfriend's children.  Believing that Weston and Cannon were alien or demon creatures who were about to kidnap and molest Donesha, [Petitioner] drew his gun and shot Weston at point blank range, once in the face and once in the chest.  Weston fell to the sidewalk and died.  Cannon fled and [Petitioner] fired after him, hitting him in the arm.  [Petitioner] then walked back to the apartment, with Donesha running ahead to tell her mother what had occurred.

Apparently misunderstanding Donesha's account, Kisha thought [Petitioner] had only fired his gun into the air.  She told him to leave because the police would probably be called.  [Petitioner] left, taking his keys, cell phone, holster, $1,681 in cash, the 9mm pistol he had

used to kill Weston and shoot Cannon, and three magazines of ammunition. He was still wearing a bulletproof vest. Continuing to believe that his battle against the "bad people" was ongoing, [Petitioner] proceeded south on Route 13 to Salisbury, Maryland, shooting at several people and vehicles along the way. In his shooting spree he narrowly missed numerous innocent bystanders, but did seriously injure Anthony White and Marsha Hankerson.

After [Petitioner] arrived in Salisbury, he went to the home of Tobias Cannon. He took a pit bull that belonged to Cannon, but shot his two other dogs, believing that they were demons. When the dog ran into the street, a SUV stopped to avoid hitting it. [Petitioner] took this as a sign that the driver of the SUV had come to aid him in his war against the demons. He asked the driver, Davondale Peters, for a ride and got in the vehicle with the dog. When Peters failed to follow all of [Petitioner's] rambling directions and started to drive slowly, [Petitioner] became suspicious. Thinking Peters also was associated with the demons he believed he was fighting, [Petitioner] jumped out of the SUV and ran around to the driver's side. He said: "No, you hold up motherfucker"; and then fired his gun several times into the SUV. Peters was mortally wounded, but was able to drive away. He drove over a curb, a mailbox, and through a fence, with the vehicle coming to rest against a house. Peters died at the scene.

After shooting Peters, [Petitioner] approached a white van that had stopped at the same intersection. Carla Green was driving the van with her daughter in the car seat behind her. [Petitioner] threw open the door and said: "This is a carjacking, bitch." Fearing for her daughter, Green slammed the door shut and stomped on the accelerator. As she drove away, [Petitioner] shot at her several times, barely missing the child safety seat, but hitting Green three times and rendering her a paraplegic. [Petitioner] then turned on Natalie Reddick, who had witnessed both of the prior shootings. [Petitioner] chased after her, but had run out of ammunition. Reddick retreated to her mother's house and refused to let [Petitioner] in. [Petitioner] then proceeded from house to house, banging on doors. As he did so, he spotted Sabrina Gilmore and her grandniece, who were also able to reach the safety of Gilmore's parents' house before [Petitioner] could descend upon them.

[Petitioner] then broke into the home of an elderly couple, Mary and Watson Dutton. He told them that someone was after him, and he needed a car to escape. Mr. Dutton refused to give [Petitioner] a car. [Petitioner] then demanded money from Mrs. Dutton, who was crying. [Petitioner] pushed her to the floor with both hands. He then threw

some glass items from the table and shelves, but after Mr. Dutton hit him with a broom, [Petitioner] left.

Deputies from the Wicomico Coutny Sheriff's Office arrived on the scene. [Petitioner] saw the officers and hid behind parked cars. Reddick came out of her mother's house, shouted to the officers, and pointed at [Petitioner]. When the deputies shouted: "Police! Stop!," [Petitioner] fled. [Petitioner] was captured after a short chase. When he was taken into custody, the officers noted that [Petitioner] was wearing body armor and had in his possession a 9 mm handgun, a holster, three magazines, $1,681 in cash, a cell phone, and keys.

*Norman v. State*, 976 A.2d 843, 848-53 (Del. 2009).

In June 2007, a Delaware Superior Court jury convicted Petitioner of one count of first degree murder, two counts of attempted first degree murder, three counts of wearing body armor during the commission of a felony, three counts of possession of a firearm during the commission of a felony, and one count of felony theft. (D.I. 19 at 1) After a four-day penalty hearing, the jury recommended a sentence of death. *See State v. Norman*, 2007 WL 3105759, at *2 (Del. Super. Ct. Sept. 28, 2007), *rev'd in part*, 976 A.2d 843 (Del. 2009). The Superior Court sentenced Petitioner to death and 145 years in prison. *Id.* at *16. Petitioner appealed, and the Delaware Supreme Court affirmed his convictions but reversed his death penalty and remanded for a new penalty hearing. *See Norman*, 976 A.2d at 872. The State declined to pursue a second penalty hearing, and the Superior Court sentenced Petitioner to life and 135 years in prison in July 2009. (D.I. 19 at 2) Petitioner filed a petition for a writ of certiorari in the United States Supreme Court, which was denied. *See Norman v. Delaware*, 558 U.S. 1015 (2009).

In June 2010, Petitioner filed a *pro se* motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I. 19 at 2) The Superior Court granted Petitioner's motion for the appointment of counsel, and the appointed counsel was provided an opportunity to file a new Rule 61 motion. After several months of discord between Petitioner and

counsel, the Superior Court held two hearings. The Superior Court declined to appoint new counsel, but informed Petitioner that he could supplement counsel's amended Rule 61 motion with issues he wished the court to consider. *Id.*

In November 2011, both Petitioner and counsel filed amended Rule 61 motions. (D.I. 19 at 2) After considering the motions, the State's reply, trial counsel's Rule 61 affidavit, and Petitioner's additional filings, the Superior Court denied the Rule 61 motions on March 6, 2013. *See State v. Norman*, 2013 WL 1090944 (Del. Super. Ct. Mar. 6, 2013). Petitioner and his counsel filed notices of appeal, and Petitioner moved for the appointment of new counsel on appeal or, in the alternative, to proceed *pro se* on appeal. (D.I. 19 at 3) The Delaware Supreme Court determined there were insufficient reasons to appoint new counsel, but granted Petitioner's request to proceed *pro se*. *Id.* On December 17, 2013, the Delaware Supreme Court affirmed the Superior Court's denial of the Rule 61 motions. *See Norman v. State*, 2013 WL 6710794 (Del. Dec. 17, 2013).

## II.     LEGAL STANDARDS

### A.     The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford,* 538 U.S. at 206.

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Coverdale v. Snyder*, 2000 WL 1897290, at *2 (D. Del. Dec. 22, 2000). "Fair presentation of a claim means that the petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *See Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000); *Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Although technically exhausted, such claims

are nonetheless procedurally defaulted. *See Lines,* 208 F.3d at 160; *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show "that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency,[1] and is established if no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *See Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir. 2002). A petitioner demonstrates actual innocence by asserting "new reliable evidence –

---

[1]*See Bousley v. United States*, 523 U.S. 614, 623 (1998).

whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," showing that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *See Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## III.   DISCUSSION

Petitioner's timely-filed habeas Petition asserts the following five grounds for relief:[2] (1) defense counsel provided ineffective assistance; (2) appellate counsel provided ineffective assistance; (3) the lower courts committed plain error and denied Petitioner his rights to a fair trial under the Sixth and Fourteenth Amendments; (4) 11 Del. Code Ann. § 401(c) is unconstitutionally vague and violates the due process clause of the Fourteenth Amendment; and (5) the cumulative impact of errors committed by the State denied Petitioner his rights under the Sixth and Fourteenth Amendments (prosecutorial misconduct).

### A.   Claim One: Ineffective Assistance of Defense Counsel

In Claim One, Petitioner asserts five specific instances of defense counsel's purported ineffectiveness. The Delaware Supreme Court denied Claim One in its entirety for being meritless. Therefore, Petitioner will only be entitled to habeas relief for the instant Claim if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

---

[2]The Court has renumbered three claims: original claim five is now Claim Two (ineffective assistance of appellate counsel), original claim two is now Claim Three (trial court committed plain error and violated Petitioner's right to a fair trial), and original claim three is now Claim Five (prosecutorial misconduct). In addition, although Petitioner's title for Claim One is that the Delaware Courts denied him due process by denying his Rule 61 motion, all of the sub-arguments in that claim allege ineffective assistance of defense counsel. Therefore, the Court has re-characterized Claim One as alleging ineffective assistance of defense counsel.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate there is a reasonable probability that, but for counsel's error the result would have been different. *See id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See id.*

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-260 (3d Cir. 1991). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Notably, a state court's decision regarding an ineffective assistance of counsel claim is owed "double deference" when reviewed under § 2254(d)(1), because

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). ***When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.***

*Harrington v. Richter*, 562 U.S. 86, 104-05 (2011) (emphasis added). When assessing the reasonableness of counsel's performance under *Strickland*, there "is a strong presumption that

counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect," and "*Strickland* [] calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Richter*, 562 U.S. at 109-10. In turn, "[w]hen assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 111-12. Finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101. In other words,

> [a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 103.

Turning to the § 2254(d) inquiry in this case, the Court notes that the Delaware Supreme Court analyzed Claim One pursuant to the *Strickland* standard. Therefore, the Delaware Supreme Court's decision is not contrary to clearly established law. *See Williams v. Taylor*, 529 U.S. 362, 406 (2000) ("[A] run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). The Court's inquiry does not end there, however, because it must also consider if the Delaware Supreme Court reasonably applied *Strickland* in denying Claim One.

### 1. Defense counsel erred in allowing the State to submit prejudicial evidence, unsubstantiated evidence, or false testimony to the jury

In his first allegation of Claim One, Petitioner complains that defense counsel failed to object to the admission of drugs, guns, and ammunition, and also failed to object to the State's

references to an outstanding warrant in Maryland and drug dealing and use. He appears to contend that defense counsel should have objected to the aforementioned evidence because it did not relate to any of the charged offenses.

The record reveals that defense counsel did object to the admission of the cocaine and marijuana that was found in Petitioner's car, but the trial court ruled that the evidence was relevant and admissible. Petitioner's conclusory assertion in this proceeding does not demonstrate a reasonable probability that a more forceful objection by defense counsel would have altered the result of Petitioner's criminal trial. Thus, the Court concludes that Petitioner's contention regarding the admission of drug evidence does not satisfy the § 2254(d) standard.

The Court also concludes that Petitioner's complaint about defense counsels' failure to object to the references to an outstanding warrant in Maryland and Petitioner's history of drug dealing and use does not warrant relief. As explained by defense counsel in their Rule 61 affidavit, and accepted by the Superior Court in Petitioner's Rule 61 proceeding, the defense strategy of presenting a "not guilty by reason of insanity" ("NGRI") defense required defense counsel to present a complete picture of Petitioner, including negative aspects of his lifestyle and prior behaviors. Expert testimony about Petitioner's mental state at the time of the crime relied, in some part, on information about Petitioner's lifestyle as a drug user and dealer. Consequently, evidence of Petitioner's significant drug use was properly put in front of the jury because Petitioner put his state of mind at issue and defense experts referred to Petitioner's drug use when opining about his state of mind.

In addition, the trial testimony relating to the outstanding warrant for Petitioner in Maryland put into context why the people who witnessed Petitioner's "manic" episode prevented him from

surrendering to the police. For instance, in their Rule 61 affidavit, defense counsel explained why they did not object to the evidence about the warrant:

> Evidence of the warrant was part of the descriptions by multiple witnesses, including Dr. Alizai-Cowan, Teresa DeShields and Kisha DeShields, in their descriptions of [Petitioner's] manic episode the night before the murder. The testimony described Petitioner's seeing aliens and his acts to protect the children of Ms. Deshields from the aliens. During this episode [Petitioner] tried to surrender to the police, but Teresa Deshields' boyfriend, Brock Hill, stopped him from doing so. The outstanding warrant explained why the people who witnessed [Petitioner] in the throes of a manic episode prevented him from surrendering to the police. Thus, by stopping [Petitioner] from turning himself in, they allowed [Petitioner's] manic episode to continue through the early hours and into the next morning. As a consequence, defense counsel, with the full consent of [Petitioner], did not object to evidence of the warrant, which put the events leading to the homicide in their proper context.

(D.I. 22 at 754) Defense counsel further explained:

> First, the defense trial strategy was to pursue [] a verdict of not guilty by reason of insanity. [Petitioner], at all times both pre-trial and during trial, and his trial counsel, agreed on that strategy. [Petitioner] and counsel also agreed that there was little, if anything, to be gained by contesting the evidence of [Petitioner's] conduct leading to his arrest. Second, trial counsel sought and obtained several *voir dire* questions of potential jurors regarding evidence of drug usage by the defendant and whether that would affect their ability to be fair and impartial jurors.

(D.I. 22 at 753)

On post-conviction appeal, the Delaware Supreme Court affirmed the Superior Court's conclusion that defense counsel's strategy to not challenge the aforementioned evidence was reasonable, due to the fact that Petitioner used the evidence to support his NGRI defense. *See Norman*, 2013 WL 671070794, at *3. After considering the record, and viewing the Delaware Supreme Court's decision through doubly deferential lens, the Court concludes that the Delaware Supreme Court's decision involved a reasonable application of *Strickland*.

13

Finally, the Court rejects Petitioner's complaint about the Superior Court's failure to hold an evidentiary hearing during his Rule 61 proceeding. The "federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceedings does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998). Therefore, the failure to conduct an evidentiary hearing during a state collateral proceeding does not present an issue cognizable in this proceeding. *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2005) (explaining that "main event" for habeas purposes is original trial).

### 2. Stipulation regarding admission of toxicology reports

Next, Petitioner contends that defense counsel should not have stipulated to the admission of a toxicology report, because the report revealed that he had drugs in his system at the time of his arrest. Petitioner asserts that the toxicology report damaged his NGRI defense because it provided evidence of his voluntary intoxication. According to Petitioner, defense counsel knew the toxicologist was unavailable to testify, which meant that the evidence could have been kept out of the trial.

The Superior Court held that defense counsels' decision to stipulate was reasonable and appropriate, given the defense strategy of pursuing the NGRI defense, because "defense counsel knew they had to expose and address [Petitioner's] criminal lifestyle, including [his admitted] drug usage." *Norman*, 2013 WL 1090944, at *13. The Delaware Supreme Court affirmed the Superior Court's decision, explaining that this aspect of Petitioner's ineffective assistance of counsel claim is meritless.

After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying the instant argument. During Petitioner's trial, the State's

14

psychiatrist, Dr. Mechanick, testified that any mental illness exhibited by Petitioner was a delirium caused by his long-term consumption of drugs. *See Norman*, 2013 WL 1090944, at *12. In contrast, two defense experts testified that Petitioner was legally insane on the day of the shootings and that his psychosis was not drug-induced. *Id.* at *14. Significantly, the stipulated toxicology report showed the presence of drugs, not that Petitioner was intoxicated, and defense counsel used the report during cross-examination of Dr. Mechanick to show that Petitioner was not acutely intoxicated at the time of the shooting. (D.I. 22 at 679) When viewed in context with this record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that defense counsels' stipulation was a reasonable strategic decision to minimize the damage that could have been rendered by Petitioner's history of drug use.

### 3. Failure to timely obtain medical records and evidence showing family history of mental illness

Petitioner argues that defense counsel were ineffective for failing to adequately investigate and obtain evidence of a family history of mental illness to support his insanity defense. Specifically, he asserts that it took defense counsel too long to obtain evidence that his maternal cousin and his paternal aunt had a "life long history of mental illness," and that his paternal aunt was in the Delaware Psychiatric Center. (D.I. 3 at 6) Since defense counsel did not provide the relevant records of Petitioner's family history to the State until after the trial began, the trial court did not allow this evidence to be introduced.

In their Rule 61 affidavit, defense counsel asserted that they were diligent in searching for evidence of Petitioner's family's history of mental illness, as demonstrated by the fact that they interviewed over 30 of Petitioner's friends and family, but they did not learn that Petitioner's aunt was a patient at the Delaware Psychiatric Center until shortly before trial. (D.I. 19 at 18; D.I. 22 at

15

749-50, 758-59)  The Superior Court held that defense counsel did not act deficiently in not timely obtaining this evidence, explaining that:

> Having seen first-hand their zealous representation, I do not find they failed to learn of [Petitioner's] aunt in a timely fashion.  When they heard of her, they attempted to obtain her records.

*Norman*, 2013 WL 1090944, at * 11.  The Superior Court also held that Petitioner did not establish prejudice, stating: "There is nothing concrete in the present motion other than speculation and unsubstantiated conclusions that Ms. Smack's records, whatever they may be, would have helped [Petitioner] or changed the outcome of the trial."  *Id.* at *12.  The Delaware Supreme Court agreed with the Superior Court's analysis and affirmed its decision.

The Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying the instant argument.  Petitioner has not demonstrated that defense counsel could have obtained the family medical records at issue any sooner.  He also has not established a reasonable probability that those records would have changed the outcome of his trial.  Accordingly, the Court will deny this portion of Claim One as meritless.

### 4.  Failure to request additional *voir dire* of various jurors

Petitioner asserts that defense counsel were ineffective during the *voir dire* process because they: (1) failed to request additional *voir dire* of Juror #2 after learning that the juror might have been charged with an offense in addition to the known driving under the influence offense; (2) did not notice that the trial court failed to ask Juror #8 Question Number 22(c) during *voir dire*; and (3) failed to ask that the entire jury panel be questioned about their feelings regarding crimes against animals. None of these allegations warrants relief.

During the initial *voir dire*, it was learned that Juror #2 had been arrested for driving under the influence.  Nobody challenged, and the juror became Juror #2.  Thereafter, the State learned

that Juror #2 was potentially charged with an additional offense. Neither the State nor the defense chose to *voir dire* Juror #2 again. Now, Petitioner asserts that defense counsel should have requested additional *voir dire* of Juror #2.

In their Rule 61 affidavit, defense counsel explained they "viewed Juror #2 as a favorable juror. Simply put, based on their observations of Juror #2 during the trial, the defense team liked him as a juror and wanted to keep him on the jury. As a result, trial counsel did not want the judge to question the juror and develop a reason to excuse him for cause." (D.I. 22 at 759-60) The Superior Court reviewed the Rule 61 affidavit and held that the decision to not request additional *voir dire* "was a strategic decision on the part of the defense team. They considered the information and made their decision. They cannot be faulted as to this decision. There is nothing in the present allegation to establish that their decision was wrong or to establish prejudice." *Norman*, 2013 WL 1090944, at *16.

In this proceeding, Petitioner's conclusory allegations fail to establish a reasonable probability that his trial would have been different had defense counsel requested additional *voir dire* regarding Juror #2's criminal history. Therefore, the Court concludes that the Delaware Supreme Court's affirmance of the Superior Court's decision constituted a reasonable application of *Strickland*.

Petitioner's contention regarding defense counsel's failure to notice that the trial court inadvertently skipped over Question 22(c) of the individual *voir dire* questionnaire for Juror #8 is similarly unavailing. Question 22(c) asked about the potential juror's ability to remain impartial if a crime had been committed in the presence of children.

The *voir dire* questionnaire contained 39 questions, some with subparts. *See Norman*, 2013 WL 1090944, at *16. In their Rule 61 affidavit, defense counsel explained that, even without

Question 22(c), the questions posed by the trial judge were sufficient to determine if Juror #8 was suitable for jury service. (D.I. 22 at 760) The Superior Court agreed, explaining that "[m]uch information was covered with the prospective jurors and the omission of this question does not mean error was injected into the jury selection process." *Norman*, 2013 WL 1090944, at *16. The Superior Court also concluded that Petitioner was not prejudiced by the omission of Question 22(c). After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in affirming the Superior Court's denial of the instant allegation.

Finally, Petitioner argues that defense counsel were ineffective for failing to request *voir dire* of all potential jurors about crimes against animals, because Petitioner's crimes included shooting two pit bulls in Maryland. Specifically, during *voir dire*, a potential juror informed the court that she heard the case involved pit bulls. In response to the trial court's question, the juror stated she owned a pit bull, which would affect her ability to be fair about an allegation that Petitioner had shot and killed a pit bull. The trial court excused her. Consequently, Petitioner contends that the entire jury pool should have been questioned about the killing of animals. (D.I. 22 at 683)

After explaining that one potential juror's response did not trigger an obligation for defense counsel to ask every juror the same question, the Superior Court opined that, since

> [t]he jury *voir dire* process is fluid and depending on answers, *sua sponte* remarks, or concerns of jurors, the Court may go down an unexpected path to address a particular issue. To now argue that the Court has to revisit with the entire panel the *sua sponte* remarks of each individual juror is unreasonable. Counsel were not ineffective and no prejudice has been shown.

*See Norman*, 2013 WL 1090944, at *17. The Delaware Supreme Court affirmed that decision.

In *Aldridge v. United States*, 283 U.S. 308, 310 (1931), the Supreme Court held that the trial judge has broad discretion over the extent of *voir dire* examination. *See id.* Fifty-years later, the Supreme Court explained that, aside from "constitutional requirements with respect to questioning

18

prospective jurors about racial or ethnic bias," the trial judge has broad discretion in determining how and what extent to conduct *voir dire*. *See Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981).

In Petitioner's case, there were no issues of racial or ethnic bias. Moreover, Petitioner has not rebutted with clear and convincing evidence the Superior Court's factual determination that the overall *voir dire* of the potential jury panel was sufficient for the trial judge to determine that each prospective juror was qualified. *See Norman*, 2013 WL 1090944 at *16-17. Therefore, the Delaware state court decisions that Petitioner did not establish prejudice resulting from defense counsels' failure to have the entire jury pool questioned about crimes against animals involved a reasonable application of *Strickland*.

### 5. Failure to request jury instructions on lesser-included offenses of second degree murder and manslaughter based on extreme emotional distress

Finally, Petitioner contends that defense counsel were ineffective for failing to request a jury instruction on the lesser-included offenses of second-degree murder and manslaughter based on the defense of extreme emotional distress stemming from his childhood sexual abuse. *See Norman*, 2013 WL 1090944, at *17. Defense counsels' Rule 61 affidavit explains their belief that none of the defense expert opinions supported a verdict based upon reckless conduct, or provided Petitioner with a basis to argue that he acted under the influence of extreme emotional distress. The Superior Court concurred, explicitly holding that:

> Defense counsel made the strategic decision not to pursue the lesser because the evidence did not support a claim for lesser. The defense was mental illness per their doctors, not that [Petitioner] shot all of the victims recklessly. [Petitioner] has not shown that his attorneys' decisions were wrong. He has not presented any evidence that shooting people was related to his sexual abuse when he was a child. This is a conclusory claim.

*Norman*, 2013 WL 1090944, at *17. The Delaware Supreme Court affirmed that decision.

In Delaware, the defense of extreme emotional distress has two elements: (1) the defendant acted under the influence of extreme emotional distress; and (2) there was a reasonable explanation or excuse for the extreme emotional distress. *See* 11 Del. Code Ann. § 641. In order for the defense to be available, there has to be a "causal relationship between the provocation, event or situation which caused the extreme emotional distress and the victim of the murder." *Id.* Here, Petitioner has not shown how his being the victim of sexual abuse as a child suddenly triggered his shooting of two innocent, random victims years after the alleged abuse. Thus, the Delaware state courts' conclusion that defense counsel made a reasonable strategic decision not to pursue the emotional distress defense constituted a reasonable application of *Strickland*.

## B. Claim Two: Ineffective Assistance of Appellate Counsel

In Claim Two, Petitioner contends that appellate counsel provided ineffective assistance on direct appeal by only raising one claim related to the guilt phase of his criminal proceeding, and by failing to raise the claims contained in the instant Petition which were also presented in his *pro se* Rule 61 proceeding. The Superior Court denied this claim after determining that the allegations regarding appellate counsels' performance lacked merit, and the Delaware Supreme Court affirmed that decision.

Claims of ineffective assistance of appellate counsel are evaluated under the same *Strickland* standard applicable to trial counsel. *See Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004). An attorney's decision about which issues to raise on appeal are strategic,[1] and an attorney is not

---

[1]*See Albrecht v. Horn*, 485 F.3d 103, 138 (3d Cir. 2007); *Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999) (counsel is afforded reasonable selectivity in deciding which claims to raise without specter of being labeled ineffective).

required to raise every possible non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745 (1983); *Smith v. Robbins*, 528 U.S. 259, 272 (2000).

After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in affirming the Superior Court's denial of Claim Two. Petitioner's conclusory allegations in this proceeding regarding appellate counsels' performance do not establish either prong of the *Strickland* standard. To the extent appellate counsels' alleged errors identified by Petitioner mirror defense counsels' errors as set forth in Claim One, the Court's conclusion that the ineffective assistance of defense counsel allegations in Claim One lack merit preclude Petitioner from demonstrating that appellate counsels' failure to present the issues underlying Claim One on direct appeal satisfies the prejudice prong of *Strickland*. Finally, appellate counsel successfully challenged Petitioner's death sentence. The fact that appellate counsel did not succeed in having Petitioner's convictions reversed does not demonstrate that appellate counsel performed deficiently, or that Petitioner was prejudiced by appellate counsels' decisions regarding which claims to assert on appeal. Accordingly, the Court will deny Claim Two for failing to satisfy § 2254(d).

### C. Claim Three: Trial Court Committed Plain Error and Violated Petitioner's Rights Under 6th and 14th Amendments on Several Occasions

#### 1. Jury instructions improperly shifted burden of proof

During his trial, Petitioner presented the affirmative offense of insanity. The State sought to negate the insanity defense by presenting testimony that Petitioner's mental state on the day of the crimes was proximately caused by voluntary intoxication. *See Norman*, 2013 WL 6710794, at *1. In the first argument of Claim Three, Petitioner contends that the trial court should have instructed the jury that the State had the burden of rebutting Petitioner's insanity defense by proving he was voluntarily intoxicated beyond a reasonable doubt.

The Superior Court denied this claim as meritless in Petitioner's Rule 61 proceeding, ruling:

> What the proposed instruction suggests is that if the defense attempts
> to establish the affirmative defense of insanity by a preponderance of
> the evidence, then the State's rebuttal evidence must be beyond a
> reasonable doubt. The Court is satisfied this is not a proper statement
> of Delaware law. The burden of proving all elements of the crimes
> charged remains on the State throughout the trial, regardless of an
> insanity defense. The instructions make this clear.
>
> But if the State pushes back with evidence contrary to the defendant's
> affirmative defense evidence, the evidentiary standard applied by the
> jury remains "by a preponderance of the evidence." The jury does not
> receive dueling standards of proof on this defense.
> The burden of proving insanity by a preponderance of the evidence is
> upon the defendant. The Court properly instructed the jury that, in
> considering all of the evidence supporting or negating the existence of
> the insanity defense, if the jury found that the evidence as a whole
> makes it more likely than not that the affirmative defense was
> established, it must return a verdict of not guilty by reason of insanity.

*Norman*, 2013 WL 1090944, at *7-8. The Delaware Supreme Court "agree[d] with the Superior

Court's analysis and conclude[d] that [Petitioners] claim [was] without merit." *Norman*, 2013 WL

6710794, at*4. Given this adjudication, Claim Three will only warrant habeas relief if the Delaware

Supreme Court's decision was either contrary to, or an unreasonable application of, clearly

established federal law.

The clearly established Supreme Court precedent governing the burden placed on

defendants raising the defense of insanity is set forth in *Leland v. Oregon*, 343 U.S. 790 (1952), and its

progeny. In *Leland*, the Supreme Court sustained an Oregon statute which required a defendant

asserting an insanity defense to prove the defense beyond a reasonable doubt. *Id.* The *Leland* Court

explained that, "[i]n all English-speaking courts, the accused is obliged to introduce proof if he

would overcome the presumption of sanity." *Id.* at 800. The fact that Oregon required a heavier

burden of proof (beyond a reasonable doubt) than 20 other states (preponderance of the evidence)

was not "significant in determining the constitutional question []." *Id.* at 798. "In each instance, in

order to establish insanity as a complete defense to the charges preferred, the accused must prove

that insanity.  The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process."  *Id.*  In *Clark v. Arizona*, 548 U.S. 735 (2006), the Supreme Court explained its reasoning in *Leland* more thoroughly, opining that:

> The force of [the presumption of sanity], like the presumption of innocence, is measured by the quantum of evidence necessary to overcome it; unlike the presumption of innocence, however, the force of the presumption of sanity varies across the many state and federal jurisdictions, and prior law has recognized considerable leeway on the part of the legislative branch in defining the presumption's strength through the kind of evidence and degree of persuasiveness necessary to overcome it.
>
> \*                              \*                              \*
>
> The burden that must be carried by a defendant who raises the insanity issue, again, defines the strength of the sanity presumption.  A State may provide, for example, that whenever the defendant raises a claim of insanity by some quantum of credible evidence, the presumption disappears and the government must prove sanity to a specified degree of certainty (whether beyond reasonable doubt or something less).  Or a jurisdiction may place the burden of persuasion on a defendant to prove insanity as the applicable law defines it, whether by a preponderance of the evidence or to some more convincing degree.  In any case, the defendant's burden defines the presumption of sanity, whether that burden be to burst a bubble or to show something more.

*Clark*, 548 U.S. at 769 (internal citations omitted)

Whether or not sanity is an element of the crime charged depends on state law.  *See Wood v. Marshall*, 790 F.2d 548, 551 n.2 (6th Cir. 1986); *see also Robinson v. Tucker*, 2012 WL 934388, at \*11 (N.D. Fla. Feb. 14, 2012) (collecting cases).  In Delaware, sanity is not an element of the crime to be proven; rather, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence.  *See* 11 Del. Code Ann. § 304 (a) (imposing preponderance of evidence standard for affirmative defense); 11 Del. Code Ann. 401(a) (permitting insanity as affirmative defense); *Daniels v. State*, 538 A.2d 1104, 1106 n.3 (Del. 1988).  Significantly, the United States Supreme Court has declined "to adopt as a constitutional imperative, operative countrywide,

that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused." *Patterson v. New York*, 432 U.S. 197, 206, 210 (1977).

Turning to the § 2254(d) inquiry in this case, the Court notes that the Delaware state courts did not cite Supreme Court precedent. Nevertheless, their decisions are not contrary to, nor an unreasonable application of, clearly established law. First, by citing and applying Delaware law regarding affirmative defenses, the Delaware courts complied with the requirements set forth in the applicable Supreme Court precedent. Second, the trial court's jury instruction set forth below was consistent with the relevant Supreme Court precedent:

> The defendant has asserted the affirmative defense of mental illness. The defendant has the burden of proving this affirmative defense to your satisfaction by a preponderance of the evidence. The State has no burden to present any evidence in this matter.
>
> After considering all of the evidence tending to support or negate the existence of the defense, you should determine whether the evidence as a whole makes it more likely than not that each element of the affirmative defense, as I have defined it for you, existed. If you find that this affirmative defense is established by a preponderance of the evidence, you must return verdicts of "not guilty by reason of insanity." Even if the defendant has not met his burden of proving this particular affirmative defense, you must acquit him if you find that the State has not met its burden of proving its case beyond a reasonable doubt.

*Norman*, 2013 WL 1090944, at *5.

In short, since Petitioner had the burden of proving insanity by a preponderance of the evidence under Delaware law, the State was not obligated to present any evidence on the issue. Rather, the evidence of Petitioner's voluntary use of illegal substances was offered for the jury to consider those facts in deciding if Petitioner met his burden of persuasion on his insanity defense pursuant to 11 Del. Code Ann. § 304(c). When viewed in this context, the Court concludes that the

Delaware Supreme Court reasonably applied clearly established federal law in denying Petitioner's contention that the trial court should have instructed the jury that the State had the burden of rebutting his insanity defense by proving voluntary intoxication beyond a reasonable doubt.

### 2. Trial court violated Petitioner's confrontation rights

Petitioner contends that the trial court violated his confrontation rights by allowing the State's witness to testify about a 2004 toxicology report. This Claim is unavailing because the parties stipulated to the admission of the report. Additionally, to the extent Petitioner relies on *Bullcoming v. Mexico*, 545 U.S. 647 (2011),[3] to demonstrate that he is entitled to relief because of an intervening change in the law, the case is inapplicable because the Supreme Court has not made *Bullcoming* retroactive to cases on collateral review. Accordingly, the Court will deny this portion of Claim Three as meritless.

### 3. Trial court erred in admitting a witness' out-of-court statement under 11 Del. Code Ann. § 3507 without a proper foundation

Under 11 Del. Code Ann. § 3507, a witness' out-of-court statement may not be admitted as evidence unless the statement is voluntary. In this portion of Claim Three, Petitioner contends that trial court erred in ruling that Kisha DeShields' prior out-of-court statement was voluntary, given her indication that she gave the statement because the police coerced her by threatening imprisonment. (D.I. 22 at 696) Petitioner did not raise this issue on direct appeal or in his initial Rule 61 motion. Consequently, when he raised the issue on post-conviction appeal, the Delaware

---

[1]In *Bullcoming*, the Supreme Court addressed the following question: "Does the Confrontation Clause permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." *Bullcoming*, 564 U.S. at 657. The *Bullcoming* Court ruled that this type of out-of-court statement is testimonial in nature and, therefore, cannot be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness. *Id.*

Supreme Court reviewed it for plain error under Delaware Supreme Court Rule 8. *See Norman*, 2013 WL 6710794, at *4.

By applying the procedural bar of Rule 8, the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-64 (1984), that its decision rested on state law grounds. Delaware Supreme Court Rule 8 is an independent and adequate state procedural rule precluding federal habeas review. *See Campbell v. Burris,* 515 F.3d 172, 182 (3d Cir. 2008). Hence, the Court cannot review the merits of this portion of Claim Three absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claim is not reviewed.

Petitioner attempts to establish cause by blaming appellate counsel for not raising the issue on direct appeal. An attorney's error can constitute cause for a procedural default, but only if the petitioner first presented that ineffective assistance of counsel claim to the state courts as an independent claim and it was determined that the attorney's error amounted to constitutionally ineffective assistance. *See Murray*, 477 U.S. at 488-89. In his Rule 61 proceeding, Petitioner contended that appellate counsel was ineffective for not challenging the trial court's ruling that Kisha DeShields' out-of-court statement was voluntary. *See Norman*, 2013 WL 1090944, at *18. The Superior Court held that the trial court's ruling was correct and denied Petitioner's ineffective assistance of appellate counsel claim as meritless. *Id.* The Delaware Supreme Court affirmed that decision. *See Norman,* 2013 WL 6710794, at *4.

After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that appellate counsel was not ineffective for failing to challenge on direct appeal the propriety of the trial court's admission of Kisha DeShields' statement. To begin, in their Rule 61 affidavit, appellate counsel explain that they did not believe the issue of

voluntariness had any merit for appeal, because the issue "was largely fact-driven where the trial court has considerable discretion in fact-finding and the found facts did appear to have some support in and not contrary to the record." (D.I. 22 at 766) Appellate counsel also believed that any prejudice suffered by Petitioner was conjectural. (D.I. 22 at 766) As counsel assert, "Ms. DeShields identified a number of statements in her first out of court statement as 'lies," so the jury had ample opportunity to disregard any allegedly prejudicial statements in her out-of-court statement based on its perception of her in-court credibility." (D.I. 22 at 766-67)

> Next, the Superior Court reviewed the transcripts and noted:

> > Although the defendant's girlfriend testified she was threatened with arrest if she did not talk with the police, the State disputed that allegation. The [Trial] Court considered the testimony of all the witnesses and the [Trial] Court heard the tape recording of her statement. The [Trial] Court heard both sides of the coin on this factual issue. It was apparent that Ms. DeShields would fall into the turncoat witness category. Voluntariness was the primary obstacle raised by the defense. I remain of the opinion that the voluntariness ruling of the [Trial] Court was correct, even with the guidance of *Taylor* [*v. State*, 23 A.3d 851 (Del. 2010)].

*Norman*, 2013 WL 1090944, at *19. After explaining that DeShields testified that what she told the police was untrue, the Superior Court held that Petitioner failed to demonstrate how the failure to raise the § 3507/voluntariness issue on appeal prejudiced him. *Id.* The Superior Court also opined that the trial court's ruling on voluntariness would have been affirmed had appellate counsel raised the issue on appeal. *Id.* When the Delaware Supreme Court affirmed the Superior Court's denial of this ineffective assistance of appellate counsel claim, it also held that the Superior Court's voluntariness ruling was correct, even when analyzed under the recent Delaware decision in *Taylor*.[4]

*See Norman*, 2013 WL 6710794, at *4.

---

[4]"Generally, [], Delaware courts take a totality of the circumstances approach in determining whether the witness' will was overborne such that the proffered Section 3507 statement was not the

On habeas review, the Court defers to the Delaware Supreme Court's interpretation and application of *Taylor*. Given Petitioner's failure to provide clear and convincing evidence to the contrary, the Court also accepts as correct the Delaware Supreme Court's factual determination that the trial court correctly concluded that DeShields' out-of-court statement was voluntary. Given this record, the Court concludes that the Delaware state courts reasonably applied *Strickland* in holding appellate counsel's failure to challenge the admission of DeShields' statement on voluntariness grounds did not amount to constitutionally ineffective assistance. Therefore, appellate counsels' performance does not provide cause for Petitioner's default of this portion of Claim Three.

In the absence of cause, the Court will not address the issue of prejudice. The miscarriage of justice exception to the procedural default doctrine is also unavailable here, because Petitioner has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny this portion of Claim Three as procedurally barred from habeas review.

### 4. Trial court did not excuse alternate juror #1

In his fourth argument of Claim Three, Petitioner contends that trial court committed plain error by either not excusing Alternate Juror #1 or failing to further investigate a report by Alternate Juror #1 that he had been contacted by a woman named Rachel from the *The News Journal*, who left him a voicemail message. The trial court investigated and determined that a woman named Rachel who worked for *The News Journal* made the call. The juror attempted to retrieve the voicemail from his home, but discovered that he had lost it. The juror provided the trial court with the notes from

---

product of a rational intellect and a free will." *Wyche v. State*, 113 A.3d 162, 165-66 (Del. 2015). In turn, the Delaware Supreme Court "generally defers to the trial court's factual determination as to voluntariness." *Taylor*, 23 A.3d at 854. Within this framework, the *Taylor* Court held that, "[w]here the procedural safeguards of *Miranda* are not followed for a witness who is ***falsely told***, but actually believes, he is under arrest, constitutional consistency requires that any Section 3507 statement that incriminates a third party be inadmissible as well." *Id.* at 855-56 (emphasis in original).

his voicemail. When asked, Alternate Juror #1 told the trial court that the experience would not interfere with his ability to be fair and impartial. (D.I. 19 at 29)

After noting that Petitioner did not raise this issue "at trial, on appeal, or in the postconviction motion," the Delaware Supreme Court applied Delaware Supreme Court Rule 8 on post-conviction appeal and refused to review the claim. *See Norman*, 2013 WL 6710794, at *4. Therefore, the fourth issue in Claim Three is procedurally defaulted.

Petitioner does not allege cause or prejudice to excuse the default of this issue. In addition, review of the argument is not available under the miscarriage of justice exception, because Petitioner has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny this argument as procedurally barred from habeas review.

### 5. Trial court erred in instructing jury about voluntary intoxication

Petitioner asserts that the trial court should not have instructed the jury about voluntary intoxication because there was no evidence that he was intoxicated at the time of offenses. Petitioner presented this argument on post-conviction appeal, but did not raise it on direct appeal or in his Rule 61 motion. The Delaware Supreme Court denied it under Delaware Supreme Court Rule 8. To the extent Petitioner attempts to establish cause by asserting ineffective assistance of counsel, it is unavailing. There was ample evidence of Petitioner's use of illegal drugs, and the crux of this case was whether his insanity was the result of his longterm ingestion of illegal drugs. Consequently, defense counsels' failure to object to the voluntary intoxication instruction did not amount to constitutionally ineffective assistance, which means that defense counsels' performance does not provide cause for the instant default.

Petitioner has not demonstrated prejudice, and the miscarriage of justice exception is not available. Therefore, the Court will deny this argument as procedurally barred from habeas review.

29

### 6. Trial court erred in instructing jury about the intent element

Next, Petitioner contends that the trial court erred by not instructing the jury that it must consider the evidence of his mental illness when determining if the State proved intent beyond a reasonable doubt. (D.I. 4 at 27) To the extent this argument merely restates argument one of Claim Three, the Court has already concluded that it lacks merit (see above). To the extent this argument should be viewed as a separate ground for relief, it is factually baseless. The trial court instructed the jury about all the elements of each charged offense, and then explained the insanity defense and the guilty but mentally ill option available to the jury. Accordingly, this portion of Claim Three does not warrant relief.

### 7. Trial court erred in granting the State's motion to preclude references to the Maryland court's finding that under Maryland law Petitioner was not criminally responsible for his behavior

Petitioner argues that he should have been permitted to tell the jury that Maryland elected not to prosecute him on the criminal charges in that state. According to Petitioner, since a Maryland court-appointed psychiatrist found that he was not criminally responsible for his conduct in Maryland, he could have used this fact to demonstrate the bias of Dr. Mechanick, who testified for the State during his trial in Delaware.

Petitioner raised this argument on post-conviction appeal, but did not raise it on direct appeal. Consequently, the Delaware Supreme Court denied the argument under Delaware Supreme Court Rule 8, explaining that the "disposition of the Maryland charges had no bearing on whether there was sufficient evidence for the jury to determine Petitioner's guilt or innocence on the Delaware charges." *Norman*, 2013 WL 6710794, at *4.

Petitioner's assertion regarding appellate counsels' failure to raise the argument on direct appeal does not establish cause for his default. As explained by the Superior Court in its Rule 61 decision:

> Dr. Mechanick did not change his opinion as to his findings between his opinion as to what occurred in Maryland and his opinion as to what occurred in Delaware. He just applied the different states' laws to the same factual findings he made. The bottom line was he opined that any delirium the defendant suffered was due to his marijuana and ecstasy consumption.

*Norman*, 2013 WL 1090944, at *19. Simply stated, Dr. Mechanick came to the same conclusion as the Maryland psychiatrist, namely, that Petitioner was not criminally responsible under Maryland law. In turn, the jury learned this fact during the penalty phase of the trial.

Given Petitioner's failure to establish cause, the Court will not address the issue of prejudice. The Court also will not review the merits of the claim under the miscarriage of justice exception, because there is no new reliable evidence of Petitioner's innocence. Accordingly, the Court will deny this portion of Claim Three as procedurally barred.

### 8. The trial court erred by aiding the State's prosecution of Petitioner

Petitioner contends that the trial court erred by admitting into evidence the cocaine and marijuana found in the cars outside his home. He argues that the admission prejudiced him because it supported the State's theory of the case that Petitioner's mental health problems were caused by the voluntary ingestion of drugs.

It is well-settled that an error of state law does is not an issue cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). By challenging the trial court's admission of evidence under Delaware Rule of Evidence 403, Petitioner is asserting an error of state law. Therefore, the Court will deny the eighth allegation in Claim Three for failing to assert a proper basis for habeas review.

Alternatively, to the extent Petitioner is asserting a claim of judicial bias, it is procedurally defaulted because the Delaware Supreme Court invoked Delaware Supreme Court Rule 8 with respect to this claim on post-conviction appeal. Given the absence of cause and prejudice, or new reliable evidence of Petitioner's actual innocence, the Court will deny this argument as procedurally barred.

### 9. Trial court erred in admitting a book into evidence

Petitioner contends that the trial court improperly admitted the book, *Above the Law*, into evidence during his trial. This allegation is belied by the record. The trial court excluded the book as trial evidence, but made it a court's exhibit to preserve the proffered evidence for consideration on appeal if a claim regarding the ruling was raised post-trial. (D.I. 22 at 784, 802) Thus, the Court will deny this argument as factually baseless.

### D. Claim Four: 11 Del. Code Ann. § 401(c) is Unconstitutionally Vague

In Claim Four, Petitioner contends that the 11 Del. Code Ann. § 401(c) is unconstitutionally vague. He asserts that the trial court improperly interpreted § 401(c) as creating a mandatory burden on the defendant to disprove prior drug usage as a proximate cause of his mental illness. (D.I. 4 at 35) Section 401(c) is set forth below:

> (c) It shall not be a defense under this section if the alleged insanity or mental illness was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor, any drug or other mentally debilitating substance, or any combination thereof, unless such substance was prescribed for the defendant by a licensed health-care practitioner and was used in accordance with the directions of such prescription. As used in this chapter, the terms "insanity" or "mental illness" do not include an abnormality manifested only by repeated criminal or other antisocial conduct.

11 Del. Code Ann. § 401(c).

A criminal statute is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," or "it encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville,* 405 U.S. 156, 162 (1972) (overturning vagrancy ordinance). "Vagueness challenges that do not involve First Amendment freedoms must be analyzed as applied to the specific facts of the case at hand." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

Section 401(c) does not criminalize any activities; it simply precludes the use of the affirmative defense if the alleged insanity or mental illness was proximately caused by voluntary intoxication. In other words, any alleged vagueness in the language of the affirmative defense did not deprive Petitioner of due process. Thus, since § 401(c) does not implicate the doctrine of unconstitutional vagueness, the Court will deny Claim Four as meritless.

To the extent Claim Four contends that the trial court erroneously construed allegedly ambiguous language contained in § 401(c) as it pertains to the burden of proof for an affirmative defense and the State's rebuttal of that defense, it merely re-assets the first argument in Claim Three. The Court has fully discussed above why argument one in Claim Three does not warrant relief. Thus, the Court will deny Claim Four's instant re-characterization of Claim Three for those same reasons.

### E. Claim Five: Prosecutorial Misconduct Deprived Petitioner of a Fair Trial

In this proceeding, Petitioner presents six instances of prosecutorial misconduct that occurred during closing argument: (a) misstatement of the law regarding the NGRI standard; (b) misstatement of the evidence as to when Petitioner's mental illness began; (c) reference to Petitioner's mental state at the time of trial rather than at the time of the crime; (d) implying that Petitioner was paranoid, not mentally ill; (e) improper vouching of Dr. Mechanick; and (f) implying

that mental illness defense was a ploy to avoid punishment. (D.I. 4 at 32-35) The only allegation presented and reviewed on its merits during Petitioner's Rule 61 proceeding was his contention that the State misstated the law during closing argument by remarking that Petitioner knew right from wrong. *See Norman*, 2013 WL 6710794, at *5. The Superior Court held that the State's remark was another way of arguing the legal principle that Petitioner did not lack "substantial capacity to appreciate the wrongfulness of [his] conduct" and that it was not a misstatement of the legal standard. *See Norman*, 2013 WL 2013 WL 1090944, at *20. The Delaware Supreme Court affirmed that decision. *See Norman,* 2013 WL 6710794, at *5.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abramson*, 507 U.S. 619, 638 (1993). Pursuant to Third Circuit precedent, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001). Simply alleging misconduct fails to establish a violation of due process because the focus of the *Darden* inquiry is the unfairness of the trial, not the conduct of the prosecutor. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982).

The Delaware Supreme court did not cite *Darden* during its analysis of the instant prosecutorial misconduct claim. Nevertheless, the Court concludes that the Delaware Supreme Court's decision was neither contrary to, nor an unreasonable application of, *Darden* and its progeny. The NGRI defense "requires the mental impairment to be so severe as to render the defendant

unable to distinguish right from wrong." *Collingwood v. State*, 594 A.2d 502, 505 n.4 (Del. 1991). When reviewed "in light of the record as a whole," it was reasonable for the Delaware state courts to hold that the State's comment that Petitioner "knew right from wrong" merely constituted another way of arguing this point. Therefore, the Court concludes that this allegation of prosecutorial misconduct is meritless.

As for the remaining five assertions of prosecutorial misconduct in Claim Five, the Delaware Supreme Court refused to review the allegations on post-conviction appeal due to Petitioner's failure to present them on direct appeal. *See Norman*, 2013 WL 6710794, at *5. Petitioner has not alleged cause or prejudice, and no miscarriage of justice will occur in the absence of this Court's review. Accordingly, the Court will deny the remaining five prosecutorial misconduct allegations as procedurally barred.

## IV. CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that Petitioner's habeas claims do not warrant relief. In the Court's view, reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court declines to issue a certificate of appealability.

## V.      CONCLUSION

For the reasons discussed, Petitioner's Application For A Writ Of Habeas Corpus Pursuant

To 28 U.S.C. § 2254 is **DENIED**.  An appropriate Order will be entered.